[No. A042776. First Dist., Div. Two. Mar. 23, 1990.]

JANE DOE, Plaintiff and Respondent, v.
RICHARD ROE, Defendant and Appellant.

COUNSEL

Bronson, Bronson & McKinnon, Elliott L. Bien, Susan K. Alexander and Alan J. Lazarus for Defendant and Appellant.

Shapiro, Galvin & Shapiro, and Tad S. Shapiro for Plaintiff and Respondent.

## OPINION

**S MITH, Acting P. J.**—The question presented on this appeal is: whether a person who knowingly fails to disclose to his sexual partner the fact that he has a sexually transmissible contagious disease may escape liability for negligence in transmitting that infection because he believed that he could not transmit it to her as long as he was symptom-free. We answer that question in the negative.

Defendant Richard Roe[1] appeals from a judgment after a court trial finding him liable to plaintiff Jane Doe for $150,000 in damages based on negligent transmittal of the virus herpes simplex II (hereafter herpes) sometime in early 1985. Defendant does not contest the court's finding that he transmitted the disease to plaintiff or the amount of damages assessed. Rather he argues that he had no duty to the plaintiff as a matter of law because the risk of asymptomatic transmission was unforeseeable in 1985.

### BACKGROUND

Viewing the record in the light most favorable to the prevailing party (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480]) the evidence at trial discloses the following pertinent facts:

Defendant and plaintiff became acquainted in early 1985 while working together at a supermarket. Defendant asked her out several times and they engaged in frank and open discussions about sexual intercourse and other personal matters. Defendant told her that he had been involved in a long-time relationship with his live-in girlfriend and plaintiff told him she was involved with a boyfriend who was a merchant marine and away at sea. Soon after he asked her out, the subject of venereal disease came up. Plaintiff told defendant that she and her boyfriend were "clean," and that she would not want to put herself in a position where she could possibly contract a sexual disease. Defendant replied, "I don't blame you, I wouldn't want one either," but did not tell her he had previously contracted herpes.

In fact, defendant had suffered three prior outbreaks of herpes. In 1978, defendant noticed a lesion on his penis and consulted Dr. Ziegler, who told him he had herpes. Defendant remembers nothing more about the conversation. He assumed he had contracted the disease from the woman he was living with at the time and did nothing more about it. In 1979, five blisters

---

[1] By stipulation of the parties and order of this court the parties have been designated by fictitious names to protect their privacy.

appeared in the same area and defendant consulted Dr. Lowry, who confirmed the previous diagnosis. When he had a third outbreak in 1981, defendant did not see a doctor or do anything else about it. Each time the lesions healed by themselves.

Defendant and plaintiff began dating in early 1985 and a sexual relationship developed. Over a four-month period, they had sex once or twice a week. Defendant never disclosed the existence of his herpes condition, nor did he ever wear a condom during sexual relations. Up to that time, he made no attempt to educate himself about the disease, nor did he tell plaintiff about it because he did not think he could give it to anybody.

In late May or early June 1985, plaintiff contracted genital herpes from defendant. Unlike defendant, who experienced only mild manifestations of the illness, plaintiff suffered greatly. She came down with 102-degree fever, swollen lymph glands, a sore throat and painful lesions on her genitalia which lasted three weeks. Since the onset of disease, she suffers outbreaks on the average of twice a month, each of which lasts about 10 days. She has undergone humiliation, severe physical discomfort and emotional distress. The disease has put a serious strain on her relationship with her boyfriend and sexual relations between them have drastically decreased both qualitatively and quantitatively. As a result of her contraction of the disease she also suffers an increased risk of cervical cancer and there is a significant chance that any child she bears will have to be delivered by Cesarean section.

## PROCEDURAL HISTORY

Plaintiff sought recovery for damages as the result of her contraction of herpes on theories of fraud and negligence. At the close of plaintiff's case, defendant moved for nonsuit on the cause of action for intentional misrepresentation. The motion was unopposed and the court granted it.

After the conclusion of the trial, the court issued a memorandum decision in which it ruled in favor of plaintiff. The court found that there was a special relationship between the parties and that defendant was negligent in either not disclosing that he was infected with herpes or taking precautions such as the use of a condom, to prevent its transmission. The court found the total damages to plaintiff to be $200,000, but it reduced that figure by 25

percent due to contributory negligence on her part.[2] No statement of decision under Code of Civil Procedure section 632 was requested or issued.

APPEAL

I

*Breach of Duty*

■ In *Kathleen K.* v. *Robert B.* (1984) 150 Cal.App.3d 992 [198 Cal.Rptr. 273, 40 A.L.R.4th 1083] (*Kathleen K.*), the court held that a person who unknowingly contracts a sexually transmitted disease such as herpes may maintain an action for damages against one who either negligently or through deceit infects her with the disease. Rejecting the claim that recognizing such a tort action would constitute an unwarranted intrusion into privacy matters, the court held that strong public policy reasons existed for imposing a duty on those who have sexually transmissible diseases to disclose such conditions to their partners. (*Id.*, at pp. 996-997.)[3] The trial court relied on *Kathleen K.,* and its ruling falls squarely within the holding of that case.

Defendant contends, however, that as a matter of law he was relieved of a duty to plaintiff to disclose his condition or take measures to prevent its spread because he believed that he could not transmit the disease unless he had an active manifestation of the infection. Defendant cites several medical articles and pamphlets, none of which were introduced before the trial court, in an attempt to show that as of 1985 the existence of asymptomatic shedding (transmission without lesions) was not well known, and it was believed even among doctors that herpes could not be transmitted as long as the patient did not have visible lesions. Since the risk of harm was unforeseeable, defendant argues, there can be no duty of care. How, he asks rhetorically, can he be faulted for not knowing more than his own doctors?

■ In determining whether a duty should be imposed, the courts are guided by the basic principle expressed in Civil Code section 1714 that

---

[2]The court cited evidence that midway through the relationship plaintiff discovered that defendant's female roommate (who plaintiff suspected might have a venereal disease) was romantically interested in defendant. The court held that once she obtained this knowledge, plaintiff should have either ended the relationship or required that precautions be taken during intercourse.

[3]Courts in other states who have addressed the issue have all recognized a similar cause of action. (See *Mussivand* v. *David* (1989) 45 Ohio St.3d 314 [544 N.E.2d 265]; *Berner* v. *Caldwell* (Ala. 1989) 543 So.2d 686; *R.A.P.* v. *B.J.P.* (Minn.Ct.App. 1988) 428 N.W.2d 103; *B.N.* v. *K.K.* (1988) 312 Md. 135 [538 A.2d 1175]; *Maharam* v. *Maharam* (1986) 123 A.D.2d 165 [510 N.Y.S.2d 104]; *S.A.V.* v. *K.G.V.* (Mo. 1986) 708 S.W.2d 651; *Long* v. *Adams* (1985) 175 Ga.App. 538 [333 S.E.2d 852].)

everyone is responsible for injury occasioned to another by his own want of ordinary care or skill. (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 434 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].) Departures from this rule are warranted only by balancing a number of policy considerations, including the foreseeability of the harm suffered, the degree of certainty the plaintiff suffered injury, the closeness of the connection between defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct and the consequences to the community of imposing a duty to exercise care. (*Ibid.*) It is unnecessary to discuss each of these factors in detail. ▇ With the exception of foreseeability, defendant does not dispute that *all* of them substantially weigh in favor of the imposition of a duty of care on his part to warn those with whom he is intimate of the existence of his infectious condition or at least take precautions against spreading it.

▇ Since the court's judgment implied a finding that defendant exposed plaintiff to a foreseeable risk, we must view the record in the light most favorable to the judgment to determine whether a reasonable trier of fact could have found the risk of harm foreseeable. (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36].) "Ordinarily foreseeability is a question of fact . . . . It may be decided as a question of law only if 'under the undisputed facts there is no room for a reasonable difference of opinion.' [Citation.]" (*Bigbee* v. *Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 56 [192 Cal.Rptr. 857, 665 P.2d 947].) ▇ " 'The degree of foreseeability necessary to warrant the finding of a duty will . . . vary from case to case. For example, in cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases *where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required.*' [Citation.] Thus, foreseeability is a somewhat flexible concept." (*Isaacs* v. *Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 125 [211 Cal.Rptr. 356, 695 P.2d 653], italics added.) ▇ In the present case, it is beyond question that our state's policy of preventing the spread of venereal disease is great and that the burden of warning a prospective sex partner is small. Thus, only a slight degree of foreseeability was needed to warrant the imposition of a duty of due care in the present case.

The evidence shows defendant knew he had herpes and that it could be transmitted by sexual contact. Although he had several outbreaks of the virus prior to 1985, defendant did absolutely nothing to find out about its contagiousness or what steps could be taken to prevent his giving it to a prospective partner. Defendant also testified that his lesions would appear

at times without warning. Knowing that he had this infectious condition and that plaintiff was concerned about contracting venereal disease, defendant entered into a sexual liaison with plaintiff and continued to have intercourse with her on a regular basis for four months without revealing to her this material fact, electing to gamble with her health rather than inform her of his condition or educate himself about the disease. Under these facts, the record supports the court's implied finding that the risk of harm was foreseeable and that defendant unreasonably failed to exercise due care to guard against this risk.[4] ■ " 'A reasonable person should know that if he/she has a contagious, sexually transmissible disease like genital herpes, the disease is likely to be communicated through sexual contact. Thus people suffering from genital herpes generally have a duty either to avoid sexual contact with uninfected persons or, at least to warn potential sex partners that they have herpes before sexual contact occurs.' " (*Mussivand* v. *David*, *supra*, 544 N.E.2d 265, 269-270, quoting *R.A.P.* v. *B.J.P., supra*, 428 N.W.2d 103, 107-108.)

■ Our conclusion is not altered by the fact that defendant did not have an active outbreak of the disease during the relationship. There is no evidence in the record to support defendant's repeated assertion that he "relied on his doctors," in failing to disclose the condition or take precautionary measures during sex. No one, much less a physician, told plaintiff that he could not transmit herpes as long he did not have lesions; defendant simply made up his mind that such was the case.[5] Dr. Norman, whom defendant consulted in 1987, testified that, as of 1985 he believed that asymptomatic transmission was *improbable,* not impossible; moreover, defendant did not hear this as a medical opinion until after he was served with the lawsuit. On the other hand, there was evidence at trial that the phenomenon of asymptomatic transmission was not only known in the medical community,[6] but reported in lay literature long before defendant commenced his affair with plaintiff.

---

[4] There is even circumstantial evidence contradicting defendant's primary claim that he exhibited no signs of active infection during his affair with plaintiff. Plaintiff testified that on June 11, nine days after she last had sex with defendant, she met him in a park, confronted him with her diagnosis of herpes and asked to see his penis. When defendant showed it to her, she noticed a small mark at the head and asked him what it was—defendant replied that he did not know.

[5] On cross-examination defendant was asked: "Well, did anyone ever tell you that herpes was contagious, *for example, when you had an existing lesion?*" He replied, "*I don't remember.* Must be my doctor. The only one I ever talked to was the doctor." (Italics added.) This passage does not, as defendant claims, establish that he relied on a physician's advice that he could *only* transmit the disease when he had visible sores. Defendant never claimed to have asked a doctor about the issue of communicability and elsewhere conceded that he did nothing to find out when herpes was contagious.

[6] As early as 1982, the existence of asymptomatic shedding was reported and the use of condoms advised. (See Corey, *The Diagnosis and Treatment of Genital Herpes* (1982) 248 J.A.M.A. 1041, 1049.)

*Kozup* v. *Georgetown University* (D.D.C. 1987) 663 F.Supp. 1048 (affd. in pertinent part (D.C. Cir. 1988) 851 F.2d. 437 [271 App.D.C. 182]), relied on by defendant as controlling, is inapposite. In that case, a blood bank was held not liable for negligently transmitting AIDS to a blood donor recipient because as of October 1982 it was not known that AIDS could be transmitted by blood. (663 F.Supp. at p. 1056.) Here, defendant admittedly had *actual knowledge* that herpes was sexually transmissible and in fact assumed he had contracted it from his girlfriend. Having discovered that he had a venereal disease, defendant did nothing. He sought no information either from his physicians or any other source about how to avoid transmitting the disease or whether it was advisable to disclose its existence to those with whom he engaged in sexual relations. *Both* experts at trial agreed that at the time in question it was sound medical advice to inform a patient who has herpes to disclose such fact to any prospective sexual partner. Finally, plaintiff testified that if such a disclosure had been made to her, she would never have consented to sexual relations. We therefore find substantial evidence to support the trial court's finding that there was a duty of care and that defendant's breach of that duty proximately resulted in plaintiff's injuries.[7]

## II

### *Right of Privacy*

■ Defendant next contends that even if the judgment is sustainable on negligence principles, the imposition of liability in this case violates his constitutional right of privacy, because "[d]efending a tort action like this one forces an individual to . . . divulge the most intimate details of a sexual relationship."

The privacy claim was fully disposed of in *Kathleen K., supra*. Simply put, the court recognized that the right of privacy is not absolute and must yield where outweighed by the state's right to enact laws which promote public health and safety. Recognizing the state's strong interest in preventing the spread of a serious and incurable disease such as herpes, the court rejected the notion that the right of privacy should insulate a defendant who

---

[7] We emphasize that our conclusion is grounded on the strong facts of this case—the conversation between the parties indicating the importance of the issue to plaintiff, defendant's knowledge that he had had several prior outbreaks of the disease and that it was given to him through sexual contact, and his total indifference toward the danger of transmitting it to plaintiff. We offer no opinion on what the outcome would be if, for example, defendant had in fact relied on medical advice that he was not contagious.

negligently or deliberately infects someone with venereal disease. (150 Cal.App.3d at pp. 996-997.)[8]

We agree with *Kathleen K.*'s reasoning. Health and Safety Code section 3198 provides that "Any person . . . who exposes any person to or infects any person with any venereal disease . . . is guilty of a misdemeanor." This provision is a strong statement by the Legislature that the spread of venereal disease is a serious public health threat and that its control is of paramount importance. The incidental burden on defendant in forcing him to disclose details of his sex life is not sufficient to outweigh the strong interest of the state in preventing the spread of communicable sexual diseases. Consequently we find no constitutional infirmity in the judgment.

### DISPOSITION

The judgment is affirmed.

Benson, J., and Peterson, J., concurred.

A petition for a rehearing was denied April 23, 1990, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied June 21 1990.

---

[8] The notion that genital herpes cannot be a venereal disease because it is not listed as such in the definitions of venereal diseases covered by Health and Safety Code section 3001 was also considered and rejected in *Kathleen K.* As noted in that opinion, section 3001 was enacted in 1957, long before herpes became the "contagious and dreadful" sexually transmitted disease it now is. (150 Cal.App.3d at p. 996-997, fn. 3.)